# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| **KELLY JANE RHODES**, | 2:17-CV-12416-TGB |
| Plaintiff, | |
| vs. | **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| **STATE OF MICHIGAN, ET AL.**, | |
| Defendants. | |

Plaintiff Kelly Jane Rhodes, a prisoner at the Women's Huron Valley Correctional Facility in Ypsilanti, Michigan, suffered serious physical injuries when an industrial laundry cart fell on her while working as a laundry porter. Plaintiff claims that the officers assisting her in unloading the laundry cart on October 15, 2015 failed to train her about the hazardous requirements of working as a laundry porter, failed to supervise her, failed to communicate with each other while a laundry cart was being lowered from a truck, and failed to warn Plaintiff as an approximately 400-pound industrial laundry cart was flung from the truck and struck Plaintiff on the head. Although the record is undisputed that Plaintiff suffered serious injuries, the question is whether the conduct of the officers violated Plaintiff's clearly established Eighth and

1

Fourteenth Amendment rights. Because the negligent or arguably reckless acts alleged here do not rise to the level of a clearly established constitutional violation, Court will **GRANT** Defendants' motion for summary judgment.

## I. Facts and Procedural History

Plaintiff has been incarcerated at the Women's Huron Valley Correction Facility (WHVCF) since May 2013. In October 2015 she was assigned to work for the Michigan Department of Correction ("MDOC")'s laundry services. As a "laundry porter" Plaintiff and other prisoners were responsible for loading and unloading semi-trucks using heavy institutional laundry carts filled with used and clean linens. An MDOC employee (Defendant Richard Jones) operated the semi-truck, and another MDOC employee (Defendant Paul McPherson) operated a hydraulic lift gate and the safety mechanisms on the lift gate so that the laundry carts could be loaded on and unloaded from the semi-truck. Jones Deposition, ECF No. 55-4, PageID.677.

The accident happened on October 15, 2015, which was Plaintiff's second day working as a laundry porter. ECF No. 55-2, PageID.632. She worked alongside two other prisoners, Anthernett Thomas and Tabitha Parker. On that morning, Defendant Jones arrived with a truck full of clean laundry carts.[1] He positioned the truck for unloading and the back door of the truck was raised. Defendant Jones, Defendant McPherson,

---

[1] The truck held roughly 18-22 laundry carts when full.

Plaintiff, and Thomas all testified that in the usual course, Defendant Jones would push or pull two laundry carts to the back of the truck (one at a time) and place them on a hydraulic lift gate that was attached to the back of the truck. Two laundry porters would meet Defendant Jones at the back of the cart and steady the laundry carts with their hands. Defendant Jones would "guide" the laundry carts on to the lift gate and ensure that the laundry porters had control of the laundry carts before letting go. Defendant Jones would then signal to Defendant McPherson who operated the hydraulic lift gate and McPherson would shout "ready." Then McPherson would operate the hydraulic lift gate carrying the two full laundry carts and lower them to the ground. The laundry porters were expected to "catch" or "steady" or "guide" the laundry carts as they were lowered. Once they were lowered, a third laundry porter would wheel the carts away and bring them into the prison. Thomas Deposition, ECF No. 55-3, PageID.664-66; Jones Deposition, ECF No. 55-4, PageID.678, 680, 682; McPherson Deposition, ECF No. 55-5, PageID.721, 723, 737; Rhodes Deposition, ECF No. 55-2, PageID.639-40.

On October 15, after approximately seven laundry carts had already been lowered from the truck, Plaintiff and another porter[2] were

---

[2] There is conflicting testimony surrounding which laundry porter was present at the back of the truck with Plaintiff at this time. Ms. Thomas states that it was Ms. Parker, while Ms. Parker states that she could not see Plaintiff when the incident occurred. Thomas Deposition; ECF No. 55-3, PageID.671; Parker's Critical Incident Report Statement, ECF No. 55-7, PageID.791. Plaintiff cannot remember anything about the day.

waiting at the back of the truck to unload two more laundry carts full of clean laundry. At that moment, according to the complaint, Jones "pushed" a laundry cart out such that it "rolled out of the truck, onto the lift gate, and off onto Plaintiff's head and neck area." ECF No. 29, PageID.231. The laundry cart struck Plaintiff in the head and landed on top of her legs. Several officers radioed for assistance and Plaintiff was taken by ambulance to a hospital in Ann Arbor. Plaintiff suffered traumatic brain injury, a fractured skull, internal cranial bleeding, fractured nasal bones, and lacerations to her face and scalp.

Plaintiff thereafter brought the underlying lawsuit against the State of Michigan, the Michigan Department of Corrections, MDOC employees Richard Jones, Paul McPherson, Sonal Patel, the warden of WHVCF, and various supervising correctional officers at WHVCF and with the Michigan State Industries ("MSI") prisoner work program. *See* Original Complaint, ECF No. 1. She alleged federal civil rights claims under 42 U.S.C. § 1983 of violations of the Eighth Amendment and Fourteenth Amendment Substantive Due Process, as well as state law claims for gross negligence, negligent operation of a government-owned vehicle, violation of the Michigan No-Fault Act and battery. The Michigan Department of Corrections and the State of Michigan were dismissed without prejudice by stipulation of the parties. *See* ECF No. 16. And Plaintiff's state law claims were dismissed with prejudice. *See* ECF No. 51. Only Plaintiff's federal claims arising under the Eighth and

Fourteenth Amendment survive. Defendants moved for summary judgment on all of Plaintiff's claims. ECF No. 48. Plaintiff responded. ECF No. 55. At the hearing on Defendants' motion, Plaintiff agreed to voluntarily dismiss the following individual defendants: Glen Garbinski, Sonal Patel, Stephanie Jackson, Shontel Barnes, Tonya Allen, and Norman Laughlin. After these voluntary dismissals, the remaining defendants are Paul McPherson and Richard Jones.

## II. Standard of Review

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to a judgment as a matter of law." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013); *see also* Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

On a motion for summary judgment, the Court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Edward*, 241 F.3d 530, 531 (6th Cir. 2001).

The moving party has the initial burden of demonstrating an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477

U.S. 317, 325 (1986). If the moving party carries this burden, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587. The trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). The Court must then determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to the trier of fact or whether the moving party must prevail as a matter of law. *See Anderson*, 477 U.S. at 252.

## III. Discussion

### A. Eighth Amendment Claims (Counts I and III)

Plaintiff asserts that Defendants Jones and McPherson violated her Eighth Amendment rights against cruel and unusual punishment and for "fail[ing] to protect" her given their special, custodial relationship. ECF No. 55, PageID.616-22. As governmental officials acting within the scope of their duty, Jones and McPherson have claimed they are protected by qualified immunity. ECF No. 48, PageID.476-81. "Qualified immunity is an affirmative defense shielding governmental officials from liability as long as their conduct 'does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." *Cartwright v. City of Marine City*, 336 F.3d 487, 490 (6th Cir. 2003) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is traditionally a two-step inquiry where courts must determine "whether the plaintiff has shown a violation of a constitutionally protected right" and whether that right is so "clearly established" that a "reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Plaintiff bears the burden of establishing that Jones and McPherson are not entitled to qualified immunity. *Cartwright*, 336 F.3d at 491.

### i. Violation of a constitutional right

To bring a claim under the Eighth Amendment "cruel and unusual punishments" provision, a plaintiff must satisfy a two-prong test that encompasses an objective element and a subjective element. *See Wilson v. Seiter*, 501 U.S. 294, 297-98 (1991). The objective element asks whether the deprivation the plaintiff experienced was sufficiently serious. *Id.* The subjective element asks whether the defendant officials acted with a sufficiently culpable state of mind. *Id.* In cases challenging prison conditions, the culpable state of mind is deliberate indifference. *Whitley v. Albers*, 475 U.S. 312, 319 (1986); *see also Bagola v. Kindt*, 131 F.3d 632, 646 (7th Cir. 1997) (stating that the standard of liability for "failure to protect" cases under the Eighth Amendment is deliberate indifference).

7

"[A]cting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of *recklessly* disregarding that risk." *Farmer*, 511 U.S. at 836; *Brooks v. Celeste*, 39 F.3d 125, 128 (6th Cir. 1994) (explaining that "a prison official acts with deliberate indifference when he acts with *criminal recklessness*") (emphasis added). This in turn means that a prison official will not be liable under the Eighth Amendment for denying a prisoner humane conditions of confinement "unless the official *knows of and disregards* an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* he must also draw the inference." *Id.* at 837 (emphasis added). This comports with the understanding that "[t]he Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'" *Id.* Therefore, it is crucial for the Court in analyzing Plaintiff's Eighth Amendment claims to "scrutinize whether prison officials acted or failed to act with a sufficiently culpable state of mind in order to determine whether a prisoner's injury was the result of punishment or a tragic accident." *Bagola*, 131 F.3d at 646. "[A]ccidents, mistakes, and other types of negligence are not constitutional violations merely because the victim is a prisoner." *Bigelow v. McQuiggin*, 2012 WL 113818, at *4 (W.D. Mich. Jan. 13, 2012).

"Prison officials charged with deliberate indifference might show, for example, . . . that they knew the underlying facts but believed (albeit

unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Farmer*, 511 U.S. at 844. Further, a prison official found to have known of a substantial risk to the prisoner's health or safety may still escape liability "if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842 (internal citations omitted).

While the Sixth Circuit has not explicitly held that prison work conditions are conditions of confinement subject to Eighth Amendment scrutiny, several other circuits and district courts within the Sixth Circuit, including the Eastern District of Michigan, have so held. *See, e.g.*, *Berry v. Bunnell*, 39 F.3d 1056, 1057 (9th Cir. 1994) (collecting cases); *Bibbs v. Armontrout*, 943 F.2d 26, 27 (8th Cir. 1991), *cert. denied*, 502 U.S. 1110 (1992) (holding that prison work conditions are conditions of confinement under the Eighth Amendment); *Jackson v. Cain*, 864 F.2d 1235, 1245 (5th Cir. 1989) ("We have found, that in certain circumstances, prison work conditions may amount to cruel and unusual punishment."); *Johnson v. Campbell*, 25 Fed.Appx. 287, 288 (6th Cir. 2001) (unpublished) (rejecting prisoner plaintiff's Eighth Amendment claim for injuries suffered while working at a recycling center because

defendants were at most negligent for creating the dangerous work conditions, and a prisoner "cannot base an Eighth Amendment claim on mere negligence"); *Jones v. Michigan*, 698 F.Supp.2d 905, 915 (E.D. Mich. 2010).

Assuming the Sixth Circuit would agree that the intentional placing of prisoners in dangerous workplace surroundings can violate the Eighth Amendment, Rhodes would still need to establish *Farmer*'s two-part test. Applying that test here, Plaintiff has alleged facts demonstrating that her work conditions were objectively, "sufficiently serious." Several officers including Jones and McPherson agreed that the nature of working with loading and unloading industrial laundry carts can be dangerous. ECF No. 55-4, PageID.683 (Jones); ECF No. 55-5, PageID.715 (McPherson); ECF No. 55-6, PageID.759-60 (Officer Andrew Noland); *see also Ambrose v. Young*, 474 F.3d 1070, 1078 (8th Cir. 2007) (concluding that working near a downed power line objectively creates substantial risk of serious harm). Further, Rhodes' complaint and evidence in the record shows that she suffered serious traumatic brain injury—among other injuries—as a result of the laundry cart striking her. As for the second factor, the Court considers the conduct of each defendant separately.

### a. Defendant Jones

While Plaintiff cannot remember anything from the day of the accident, ECF No. 55-2, PageID.634, Thomas testified that she watched

Defendant Jones "fling" the laundry cart. ECF No. 55-3, PageID.667. She said that she was standing behind Rhodes when she saw the cart being flung from the truck and knew it would strike Rhodes "because [there] wasn't no stopper on her side." *Id.*[3] Defendant Jones confirmed that the truck he drove that day was not equipped with a "stopper" that is usually outfitted at the end of the hydraulic lift gate. ECF No. 55-4, PageID.678. He also stated that it would be safest if all lift gates included these stoppers. *Id.* Jones testified:

> Q: Did you ever push them out and let the inmates catch them?
> A: No.
> Q: You held on to them until they had them secured, right?
> A: Correct.
> . . .
> Q: And how would you know that they had them?
> A: They would say: I've got it.
> . . .
> Q: But you told me you didn't talk to them and say anything to Ms. Rhodes on this date?
> A: Yeah, I don't believe I did.
> Q: Okay. So how is it that you know that she had this cart when you left it with her?
> A: I don't know.

ECF No. 55-4, PageID.681-82. Of this incident, Jones testified:

> Q: Okay. What do you think happened?
> A: I believe the cart came out and Ms. Rhodes had a hold of it. It was given to her, just like every other cart is given to all the other inmates, and I believe she took her hands off it. I

---

[3] Thomas is referencing a piece of plywood that was often placed at the end of the hydraulic lift gate to prevent the laundry carts from falling. ECF No. 55-3, PageID.662. The wooden "stopper" as it was called, was used in older trucks that did not come equipped with such a stopper. ECF No. 55-4, PageID.678.

believe, for whatever reason, she quit caring and that she let go of the cart.

Q: To fall over and crush her?

A: I think the cart came off. Whether it was being lowered – and, again, I don't know this for a fact because I had already turned. If you read my statement, I had already turned and headed back into the trailer when the cart had fallen. So whether the cart was being lowered down [by McPherson] or she took her hands off of it, it would be speculation. I don't know what happened.

ECF No. 55-4, PageID.683. McPherson could neither corroborate nor refute Jones' testimony, stating only that "[t]he cart struck Rhodes. I don't know if it was pushed or guided out." ECF No. 55-5, PageID.723. However, he also stated that he did not see Jones standing at the back of truck when the cart was beginning to fall on Rhodes. *Id.* at 727.

A reasonable inference from these lines of questioning is that Jones knew Plaintiff faced a substantial risk of serious harm when he brought the laundry cart to the lift gate at the edge of the truck. This is because he knew that he had neither communicated to her nor received verbal confirmation from her that she had secured the cart by holding it. A reasonable inference is that Jones knew that it was very likely Rhodes was not aware a laundry cart was ready for her to grab and therefore Jones knew Rhodes faced a substantial risk of serious harm as a result of his actions.

That said, there is also evidence from Jones (and other witnesses) that he attempted to mitigate any serious risk of harm if a prisoner happened to not be looking. He testified that "[e]veryday" he told

prisoners that if a cart begins to fall to just "get out of the way." ECF No. 55-4, PageID.691. Plaintiff testified that no one instructed her to move out of the way in the event that a laundry cart fell or tipped out of truck while she was training on her first day. ECF No. 55-2, PageID.640 ("Q: Did they tell you what to do in the event that one of them started to fall? A: No."). Though she conceded it would be "common sense" to move out of the way if you had the time to react quickly enough. *Id.* at PageID.649.

There is also evidence that Jones was not aware that the serious risk of harm was actually likely. Jones testified that in the tens of thousands of laundry carts he has unloaded from these trucks, he states that this has never happened before. *Id.* at PageID.691. He also testified that no one ever complained to him that he was "flinging" the carts too quickly. *See id.* at PageID.689 ("So what I'm saying is if this was true and everyday I was slinging carts, you know, nobody said anything to me. Not one person."). However, Inmate Thomas disputes this, testifying that while she had never seen a laundry cart fall on an inmate before, laundry carts have fallen off of trucks "a couple" of times. ECF No. 55-3, PageID.670. She testified that no one was injured because the laundry porters "knew to move." *Id.*

And Jones also testified to knowing that it was only Plaintiff's second day on the job. ECF No. 55-4, PageID.680. And while he told Plaintiff to move if a cart ever fell, Thomas testified that when the cart

was falling, Rhodes "moved forward, not back," and that she tried to grab the cart rather than let it go. ECF No. 55-3, PageID.667. She testified:

> [Jones] was in a rush, but when it came to a tilt, you was supposed to let it go, period. We told [Rhodes] that, yes. We told her the day before and we told her that the day as a forewarning, and then when I told her to move and scream out the way, she went the other – I don't know if it was a panic for her to move that way, but she moved the wrong way, so it could have tilted towards her.

> ECF No. 55-3, PageID.669.

And Thomas also testified that Jones did not act according to the normal procedure that day:

> He was supposed to – what he usually does, what the truck driver usually does, he will grab two bins, put it at the front of the lift, push one down, you got it, make sure you have control of it, then let the next one go and then we'll lift it down. This time he didn't do none of that. This day he didn't do any of that.

ECF No. 55-3 PageID.669. Thomas testified the risk of harm was even greater because the side of the truck Plaintiff stood at did not have the wooden "stopper" that is often placed at the end of the truck to prevent carts from rolling off. *Id.* at PageID.670.

In light of this testimony, the Court considers several facts: that Jones knew the laundry carts were dangerous, he knew that the wooden "stopper" was not in place that morning, he knew that this was Rhodes' second day on the job, that Thomas believed Jones did not act according to normal procedures, that Jones and other laundry porters told Rhodes to move out of the way if a laundry cart fell, that Jones had never

experienced a prior incident of a laundry cart falling on a prisoner or a prisoner complaining directly to him about flinging carts too quickly, and that Thomas knew of a least a handful of prior incidents where laundry carts almost fell on prisoners but prisoners knew to move out of the way. But even where plaintiffs could cite to prior incidents in the record, courts have been hesitant to find that a defendant had the requisite knowledge to even create a genuine issue of deliberate indifference to a serious issue of workplace safety. *See Warren v. Missouri*, 995 F.2d 130, 131 (8th Cir. 1993) (knowledge of 29 similar table saw injuries in the 5 years preceding the plaintiff's injury was insufficient to create a genuine issue of deliberate indifference where defendants introduced evidence that the machine had been operated more than 28,600-man hours during that period).

The Court finds that in balancing all of these facts in the light most favorable to Rhodes, Jones' actions lie right on the cusp between criminal recklessness and negligence. Indeed, even Jones conceded that he did not ensure that Rhodes had secured the laundry cart with her hands before he let go, with full awareness that Rhodes was new to the job and that the laundry cart was heavy and dangerous. The Court therefore concludes that genuine issues of material fact exist as to whether Jones acted with deliberate indifference to a substantial risk of serious harm to Rhodes because a jury could conclude based on the facts in the record that Jones acted with criminal recklessness. *See McCracken v. Haas*, 324

F.Supp.3d 939, 947 (E.D. Mich. 2018) (stating that the deliberate indifference inquiry is "ill-suited for summary judgment in all but the clearest of cases") (quoting *Doe v. District of Columbia*, 215 F.Supp.3d 62, 77 (D.D.C. 2016)). This does not end our inquiry, however, because the Court must also address the question of whether at the time Jones acted, he knew or should have known that his actions amounted to a clearly established violation of the Eighth Amendment's guarantee against cruel and unusual punishment.

### b. Defendant McPherson

Defendant McPherson was responsible for lowering the hydraulic lift gate once the laundry carts were secured at the end of the truck by the receiving laundry porter. Plaintiff argues McPherson acted with deliberate indifference because he testified to agreeing that an unguided laundry cart posed a significant risk of harm to a receiving laundry porter, he was aware that Rhodes was inexperienced, and Thomas testified that he lowered the gate lift too early, which caused further instability as the cart fell off of the hydraulic lift. ECF No. 55, PageID.622. But Thomas gives conflicting testimony regarding whether the lift gate was lowered too early. At one page of Thomas' deposition transcript Plaintiff cites, page 34, Thomas testifies that "[t]he lift gate didn't even come down yet. He was about to bring it down when everybody was like no." ECF No. 55-3, PageID.667. But at another page

of her deposition Thomas testifies that the hydraulic lift "was coming down" when the laundry cart "came off." *Id.* at PageID.672.

Further, Jones testified that where Rhodes was standing—next to McPherson—she was in McPherson's blind spot. PageID.693 ("He was standing closest to her, but he wouldn't – he would not be able to see her with a cart – between with the cart on the lift gate and her holding the cart where she was standing, he wouldn't be able to see her. That would be a blind corner."). After a careful review of the record, the Court concludes that there is a factual dispute as to whether McPherson lowered the hydraulic lift gate too early. But even assuming McPherson lowered the gate too early, this action sounds in mere negligence—not the heightened culpability of recklessness required by *Farmer*. Therefore, the Court **GRANTS** Defendant's motion for summary judgment as to Counts I and III with respect to Defendant McPherson because Rhodes has not shown that McPherson violated the Eighth Amendment.

### ii. Whether the constitutional right was clearly established

Even if Rhodes raises a genuine issue of material fact as to whether Jones acted with deliberate indifference to a serious risk of workplace injury, creating a jury question as to whether Jones violated the Eighth Amendment, Rhodes must *also* establish that Jones knew or should have known that his actions would amount to an Eighth Amendment violation. Rhodes cannot make this showing.

To determine whether a right was "clearly established" at the time the state official acted, "existing precedent must have placed the statutory or constitutional question confronted by the official beyond debate." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (internal quotations omitted). "Ordinarily, a Supreme Court or Sixth Circuit decision on point is necessary" to clearly establish the right in the relevant context to defeat qualified immunity. *Reynolds v. City of Anchorage*, 379 F.3d 358, 367 (6th Cir. 2004). However, the Sixth Circuit has also stated that "[a] right is clearly established if there is binding precedent from . . . the district court itself, or case law from other circuits which is *directly* on point." *Barrett v. Harrington*, 130 F.3d 246, 264 (6th Cir. 1997) (emphasis added) (citing *Cameron v. Seitz*, 38 F.3d 264, 272-73 (6th Cir. 1994) (". . . although the decisions from other circuits must be clear and directly on point.")); *Crehan v. Davis*, 713 F.Supp.2d 688, 696 (W.D. Mich. 2010) (stating that unpublished Sixth Circuit decisions cannot "clearly establish" "a principle or the proper application of a principle to a set of facts, because such decisions are not binding").

Here, Defendants argue they are entitled to qualified immunity because it is not clearly established in the Sixth Circuit that prison work conditions are conditions of confinement subject to Eighth Amendment scrutiny. ECF No. 48, PageID.478. As discussed above, this is true. However, there appears to be a consensus among several circuits that prison work conditions are conditions of confinement subject to Eighth

Amendment protection. *See, e.g.*, *Bibbs v. Armontrout*, 943 F.2d 26, 27 (8th Cir. 1991), *cert. denied*, 502 U.S. 1110 (1992).

That said, the Supreme Court has cautioned courts "not to define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff*, 572 U.S. at 779 (internal citations and quotations omitted). To this end, it is pertinent that the Court analyze Rhodes' alleged violations with a reasonable degree of particularity and look beyond the question of whether, in the Sixth Circuit, prison work conditions are conditions of confinement subject to Eighth Amendment scrutiny. The Court must be confident that a reasonable officer in Defendant Jones's shoes would have understood that what he was doing violated Plaintiff's Eighth Amendment rights.

Against Defendant Jones, Plaintiff's complaint alleges various omissions—such as a failure to properly train, supervise, communicate and warn Plaintiff about her job as a laundry porter, failure to ensure that the hydraulic lift was properly operated and positioned before the pushing the cart off of the truck, failure to communicate with McPherson about the positioning of the lift, and failure to warn Plaintiff of the impending danger once he pushed the laundry cart—all with the knowledge that doing so would cause a substantial risk of serious harm to Plaintiff. *See* Amended Complaint, ECF No. 29, PageID.236-38. Plaintiff bolsters this with more affirmative conduct as well, citing

deposition testimony. For example, Plaintiff's complaint alleges that Jones actively "pushed an extremely dangerous cart out of the truck without first checking to see if it was safe." *Id.* at PageID.238. Rhodes further argues Jones knew of the substantial risk of serious harm that an unguarded laundry cart could have on a person expected to catch it because they had the potential to roll off of the lift gate while the gate was being lowered. *Id.* Plaintiff alleges that Jones was aware that Rhodes was inexperienced and that he "flung" or "pushed" the cart at her, rather than "guiding" it off. *Id.* Plaintiff asserts that any reasonable officer would understand that such actions would cause a substantial risk of serious harm to an inexperienced person in Plaintiff's shoes. *Id.*

Of those courts that have held that prison workplaces are conditions of confinement subject to Eighth Amendment scrutiny, all appear to adopt the same rule: "the Eighth Amendment is implicated in the prison workplace context only when a prisoner employee alleges that a prison official compelled him to 'perform physical labor which [was] beyond [his] strength, endanger[ed his life] or health, or cause[d] undue pain." *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006) (quoting *Berry v. Bunnell*, 39 F.3d 1056, 1057 (9th Cir. 1994)); *see also Ambrose v. Young*, 474 F.3d 1070 (8th Cir. 2007); *Jones v. Michigan*, 698 F.Supp.2d 905, 914 (E.D. Mich. 2010) (quoting *Ray v. Mabry*, 556 F.2d 881, 882 (8th Cir. 1977)).

Plaintiff relies on a number of these cases to argue that they are sufficiently analogous to put a reasonable officer on notice that his actions would have violated Rhodes' Eighth Amendment rights. *See* ECF No. 55, PageID.617-18 n.2. For example, Plaintiff relies on *Ambrose v. Young*, 474 F.3d 1070 (8th Cir. 2007). ECF No.55, PageID.617-18 n.2. In *Ambrose*, the Eighth Circuit considered whether South Dakota correctional officers violated a prisoner's Eighth Amendment rights by failing to protect him during a Department of Corrections ("DOC") work detail, which resulted in Ambrose's electrocution death caused by a downed power line. While responding to a storm clean-up, Ambrose and other minimum-security inmates participating in a DOC emergency response team ("ERT") work program, observed a downed power line start a small electrical fire. The DOC's ERT commander asked if the group felt it was possible to stomp out the fire, and several prisoners responded agreeably and began stomping out the fire. *Id.* When the fire subsided and the commander told the prisoners to step back, Ambrose tripped and came into contact with the dangling power line. *Id.* The power line wrapped around Ambrose and electrocuted him for one to two minutes, killing him. *Id.* Multiple prisoners attempted to reach out to Ambrose to help him, but the commander ordered them not to because he did not want them to get electrocuted as well. *Id.*

Ambrose's estate brought a § 1983 claim against the EMT commander (among others), alleging he violated Ambrose's Eighth

Amendment rights for failing to protect Ambrose from being electrocuted. *Id.* The district court denied the defendant's summary judgment based on qualified immunity and the Eighth Circuit affirmed.

The Eighth Circuit concluded that Ambrose had met the objective and subjective prongs with respect to the EMT commander. The objective prong was met because the officials did not dispute that working near a downed power line creates a substantial risk of serious harm. *Id.* at 1078. The subjective prong was met because the court found that the ERT commander's "instruction to stomp out a fire burning near a dangling, live power line constituted deliberate indifference to a known and substantial risk." *Id.* The court then turned to the qualified immunity question of "whether the law was clearly established at the time of Ambrose's death, such that a reasonable officer would understand [that the ERT commander's] conduct violated the law in the circumstances he confronted." *Id.* The court concluded that it was "well-established" in the Eighth Circuit that "knowingly *compelling* an inmate to perform labor that is . . . dangerous to his or her life or health is a violation of the Eighth Amendment" and it was clear that instructing a prisoner to stomp out a fire burning near a dangling, live power line was an act "compelling" the prisoner to perform an act that was dangerous to his life. *Id.* (collecting cases). The Eighth Circuit, therefore, relied both on the proactive actions of the corrections officer and Eighth Circuit precedent establishing that

"knowingly compelling an inmate to perform labor that is . . . dangerous to his or her life or health" is a violation of the Eighth Amendment. *Id.*

While Rhodes relies on *Ambrose*, the Court finds *Ambrose* is not sufficiently "on point" to put a reasonable officer on notice Jones' conduct violated the Eighth Amendment. *Blake*, 179 F.3d at 1007. In *Ambrose* the facts alleged that the ERT commander *compelled* Ambrose to stomp on the fire. Here, Jones did not direct or compel Rhodes to do anything. Rather, Jones' arguably reckless conduct caused injury to Rhodes when he "flung" the laundry cart to an inexperienced porter without ensuring that she knew it was coming or had safely grabbed a hold of it.

Plaintiff also relies on *Berry v. Bunnell*, 39 F.3d 1056 (9th Cir. 1994). In *Berry*, a prisoner brought a § 1983 suit against prison officials alleging that they violated his Eighth Amendment rights when they required him to work an extra eight-hour shift as a clerk. *Id.* at 1057. The Ninth Circuit affirmed the district court's grant of the prison officials' motion for a directed verdict, reasoning that in the Ninth Circuit, "the Eighth Amendment does not apply unless prisoners are compelled to perform physical labor which is beyond their strength, endangers their lives or health, or causes undue pain." *Id.* The Ninth Circuit cited a Northern District of Illinois case for support, which held that "merely forcing a prisoner to work 16 to 18 hours per day did not violate his Eighth Amendment rights." *Id.* (citing *Woodall v. Partilla*, 581 F.Supp. 1066, 1077 (N.D. Ill. 1984)).

The Eighth Circuit followed similar reasoning in *Ray v. Mabry*, concluding that a plaintiff's claims could constitute cruel and unusual punishment under the Eighth Amendment where prison officials forced him to work 90 to 120 hours per week, forced him to perform overly demanding tasks because he is physically disabled, and accosted him with threats and other derogatory comments. 556 F.2d 881, 882 (8th Cir. 1977). These allegations were sufficient under the framework articulated in *Ambrose* and *Berry* that "the Eighth Amendment does not apply unless prisoners are compelled to perform physical labor which is beyond their strength, endangers their lives or health, or causes undue pain." *Id.* *Berry*, *Mabry*, and *Ambrose* are not helpful to Plaintiff because Rhodes does not allege that she was forced to work excessive hours or compelled to take on an unreasonably dangerous task or engage in physical labor beyond her strength.

Plaintiff also relies on *Morgan v. Morgensen*, where the Ninth Circuit considered a prisoner who was injured by a defective printing press while working at a voluntary prison job. 465 F.3d 1041, 1043 (9th Cir. 2006). The plaintiff told his supervisor that the printing press was defective, but the officer told him to continue working and to "just be very careful." *Id.* at 1044. The plaintiff's hand was later caught in the press, tearing his thumb off. *Id.* The plaintiff sued the prison supervisor under § 1983, alleging he violated the plaintiff's Eighth Amendment rights by forcing him to work with a defective machine. The prison supervisor

argued he was entitled to qualified immunity claiming it was not clearly established that a prisoner could make out an Eighth Amendment violation "when he alleges that a prison official compelled him to continue working with defective prison equipment." *Id.* 1046. The district court denied the defendant's motion for summary judgment and the Ninth Circuit affirmed, concluding there was sufficient circuit precedent to put the correctional officer on notice that ordering a prisoner to continue working with defective prison workplace equipment after the prisoner alerted them to the dangerous defect would violate a prisoner's Eighth Amendment rights. *Morgan* is unhelpful to Plaintiff on two fronts. First, *Morgan* involves an officer *compelling* a prisoner to work with defective prison equipment—factual allegations not made here. Second, under the facts of that case, the supervisor was on notice of a known defect exposing the prisoner to a dangerous condition—while Rhodes' case involves neither compulsion nor the existence of defective prison machinery. Case law from a non-binding circuit must be sufficiently "on point" to be considered "clearly established law," but, like *Ambrose*, *Morgan* is too inapposite to put a reasonable officer on notice that Jones' conduct, as alleged by Rhodes, would constitute an Eighth Amendment violation.

Plaintiff additionally points to a large swath of cases from federal district courts in the Sixth Circuit to attempt to show that the law was clearly established. *See* ECF No. 55, PageID.618 n.3. But again, none are so "directly on point" as to put a reasonable officer on notice that Jones'

conduct would violate Plaintiff's constitutional rights; rather, they merely show that the Eighth Amendment may be implicated when prisoners are "forced to perform physical labor 'which is beyond their strength, endangers their lives, or causes undue pain.'" *See e.g.*, *Smiley v. Tennessee*, 2017 WL 3975001, at *14-16 (E.D. Tenn. Sept. 8, 2017) (exposure to harmful airborne contaminants in prison work plant not deliberate indifference in violation of Eighth Amendment where plaintiffs did not allege how each defendant knew of substantial risk of serious harm or failed to take reasonable steps to abate it); *Dowell v. Fulton Cty. Jail Officers*, 2015 WL 7779993, at *1, 3 (W.D. Ky. Dec. 1, 2015) (allowing Eighth Amendment claim to survive *pro se* screening pursuant to 28 U.S.C. § 1915A where county prisoner tasked with cutting down trees was injured by a jack saw after he warned the officer who directed him to cut the tree that it would "jackknife up the saw"); *Nettles v. Smoker*, 2015 WL 1565429, at *5 (W.D. Mich. Apr. 8, 2015) (merely recognizing that prison work assignments are conditions of confinement under the Eighth Amendment); *Santure v. Hatt*, 2012 WL 7807968, at *10 (E.D. Mich. Sept. 24, 2012) (qualified immunity where prison official would not reasonably have known that "permitting (or even requiring) [plaintiff] to operate a grinder that was missing its guard and handle would constitute constitutionally-actionable deliberate indifference"); *Jones v. Michigan*, 698 F.Supp.2d 905, 915-16 (E.D. Mich. 2010) (no Eighth Amendment violation where defendant did not actually perceive

the potential significant risk of harm even though plaintiff argued defendant knew he could not perform the work); *Mathis v. Caruso*, 2009 WL 2871197, at *3-4 (W.D. Mich. Sept. 1, 2009) (dismissing Eighth Amendment claim where worker's removal of caution sign from an open drain was only negligence); *Ward v. Ky. State Reformatory*, 2009 WL 2342724, at *3 (W.D. Ky. July 28, 2009) ("[F]ailing to provide a wet floor sign where soup had spilled and by failing to properly train and supervise staff do not meet the level of deliberate indifference required . . . under the Eighth Amendment[.]"); *Middlebrook v. Tennessee*, 2008 WL 2002521, at *11 (W.D. Tenn. May 6, 2008) (recognizing that several circuits have held that the Eighth Amendment may be implicated for prison work conditions); *Wilcox v. Ohio Penal Indus.*, 2007 WL 2206558, at *2 (S.D. Ohio July 27, 2007) (no Eighth Amendment violation for injury sustained from defective machine where no facts were alleged showing that the defendant had prior knowledge of the machine's working condition and ignored the risk to inmate safety); *Crow v. Dailey*, 2006 WL 2734433, at *2 (W.D. Ky. Sept. 21, 2006) (slipping and falling on orange juice spilled from containers unloaded by plaintiff does not support Eighth Amendment claim but is, at most, negligence); *Terrill v. Bertussi*, 2005 WL 3277990, at *5 (W.D. Mich. Dec. 2, 2005) (no Eighth Amendment violation where defendant had previously ordered plaintiff to use scaffolding, even after being told not to let prisoners on scaffold, because there was no indication defendant was aware of any specific risk

to plaintiff's health or safety and because defendant was not the specific officer who ordered plaintiff to use the scaffold in the instance when plaintiff was injured); *Lentz v. Anderson*, 888 F.Supp. 847, 849-50 (N.D. Ohio 1995) (denying summary judgment on plaintiff's Eighth Amendment claim alleging inadequate ventilation because defendants did not request it but recognizing that Eighth Amendment claims have been based on inadequate ventilation).

At oral argument on Defendants' motion, Plaintiff brought the Court's attention to a case from the Northern District of Florida, *Alexander v. Barefield*, where a corrections officer ordered a plaintiff to climb up a 12-foot ladder to help a fellow inmate "before I lock you up" and where the plaintiff warned the officer that the ladder could not sustain two people. 2007 WL 1655383, at *1 (N.D. Fla. June 7, 2007). The ladder collapsed and the plaintiff fell nine feet, injuring his back. The court held that a genuine issue of material fact existed because the plaintiff had sufficiently described "an attitude of deliberate indifference" because the defendant knew of and disregarded an excessive risk to the plaintiff's health or safety. *Id.* at *6. But *Alexander* is also not directly on point such that a reasonable officer in Jones' shoes would understand that his conduct would constitute constitutionally-actionable deliberate indifference. Unlike the corrections officer in *Alexander* who ordered the plaintiff to climb up a ladder after being told that it could not hold the plaintiff's weight, the record viewed in the light most favorable to Rhodes

shows that Jones "flung" the laundry cart without ever being told that he was "flinging" carts too quickly or knowing that such conduct had caused anyone to be hit with a cart in the past. While the record does support the allegation that Jones moved the cart toward the end of the truck without first checking to make certain that  Rhodes was in place and prepared to catch it, it also shows that Plaintiff had previously been instructed to move out of the way if she could not catch it.

And unlike *Alexander*, Jones did not act in direct contravention to a *known* risk. Rather, Jones' actions are more akin to the officer's actions in *Owens v. Cty. of Ingham*, 2008 WL 324292, at *3-4 (W.D. Mich. Jan. 7, 2008). In *Owens*, the plaintiff jailee was instructed, along with three other inmates, to move a large wooden desk using a furniture dolly that did not have a safety strap. While they were moving the desk, the furniture dolly "tipped over" and the desk fell on the plaintiff's knee, which required surgery and resulted in life-long knee complications. The plaintiff brought an Eighth Amendment claim alleging the defendants forced him to work in unsafe conditions. After acknowledging that the Eighth Amendment can only be violated in the context of prison work assignments when a prison official "knowingly compels convicts to perform physical labor which is beyond their strength, or which constitutes a danger to their lives or health, or which is duly painful" the court granted the defendants' summary judgment. *Id.* at *3-4. The court stated it reached this conclusion because "Plaintiff has submitted no

evidence from which a reasonable person could conclude that moving a desk (with the assistance of three other inmates) with a furniture dolly (albeit one without safety straps) was beyond Plaintiff's strength, subjected Plaintiff to undue pain, or otherwise risked his life or health. In fact, as at least one court has recognized, requiring inmates to move furniture with a furniture dolly that was not equipped with safety straps constitutes, at most, negligence." *Id.* at *4 (citing *Stephens v. Johnson*, 83 F.3d 198, 200-01 (8th Cir. 1996)).

Like this case, *Owens* involves the moving of heavy items in a prison, the lack of a safety feature on the equipment used in transporting that item and a resulting serious physical injury. Although Jones' conduct could arguably be distinguishable as reckless rather than merely negligent, cases like *Owens* demonstrate that Jones' conduct falls on the border between these two levels of culpability. But when the doctrine of qualified immunity is invoked, in order to overcome it Plaintiff must show that the law was clearly established that Jones' conduct would amount to constitutionally-actionable deliberate indifference. If the court in *Owens* did not find the conduct at issue in that case to constitute deliberate indifference, the law was not so clearly established so that a reasonable officer could be expected to know that Jones' conduct, as alleged by Rhodes, was constitutionally-actionable deliberate indifference.

In sum, Plaintiff has not demonstrated—and the Court cannot locate any clearly established law indicating—that the failure to train, supervise or warn a prisoner of the serious risk of harm caused by transporting industrial laundry carts in the course of a prison work assignment violates a prisoner's Eighth Amendment rights. The closest equivalent the Court can locate in the context of prison workplace safety is that prison officials run afoul of the Eighth Amendment only when they have "knowingly compel[led prisoners] to perform physical labor which is beyond their strength, or which constitutes a danger to their lives or health, or which is unduly painful." *Jones v. Michigan*, 698 F.Supp.2d 905, 914 (E.D. Mich. 2010) (quoting *Ray v. Mabry*, 556 F.2d 881, 882 (8th Cir. 1977)). Applying these cases, the Court cannot conclude that "the contours of the right were sufficiently clear that a reasonable prison official would or should have understood" that "flinging" an approximately 400 pound industrial laundry cart out of the back of a truck to an untrained laundry porter without ensuring she was aware of its approach violates the prisoner's Eighth Amendment rights. *Anderson*, 483 U.S. at 640. Accordingly, Defendant Jones is entitled to qualified immunity. The Court, therefore, **GRANTS** Defendants' motion for summary judgment as to Counts I and III.

## B. Substantive Due Process -- Bodily Injury (Count II)

The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of

law." U.S. Const. amend. XIV, § 1. This provision "guarantee[es] more than fair process." *Washington v. Gluksberg*, 521 U.S. 702, 719 (1997). It includes a substantive component as well, "barring certain government actions regardless of the fairness of the procedures used to implement them." *Daniels v. Williams*, 474 U.S. 327, 331 (1986); *see also Cty. Of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998). To bring a claim under Fourteenth Amendment Substantive Due Process, a plaintiff first must demonstrate a deprivation of a constitutionally protected liberty interest. *Guertin v. Michigan*, 912 F.3d 907, 918 (6th Cir. 2019). Once a plaintiff can show the deprivation of a constitutionally protected liberty interest, they then "must show how the government's discretionary conduct that deprived that interest was constitutionally repugnant." *Id.* at 922.

Defendants raise a principal objection to Plaintiff's Fourteenth Amendment Bodily Integrity claim: that the subject of her claim is "necessarily governed by a more definite provision of the Constitution (to the exclusion of any possible application of substantive due process)." *Lewis*, 523 U.S. at 842-43. Specifically, Defendants allege Plaintiff's bodily integrity claim must be dismissed because specific constitutional provisions in the Eighth Amendment control over the Fourteenth Amendment's general due process provisions. ECF No. 48, PageID.476. This rule, developed by the Supreme Court in *Graham v. Connor*, provides that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of

government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)); *see also Lewis*, 523 U.S. at 842. Substantive due process analysis, therefore, is only appropriate in this case if Plaintiff's claim is not "covered by" the Eighth Amendment. *Lewis*, 523 U.S. at 842-43.

But here, Plaintiff's Fourteenth Amendment claim is covered by the Eighth Amendment. The Supreme Court held in *Whitley v. Albers*, that the Eighth Amendment is the appropriate doctrine to invoke when a prisoner challenges the deliberate use of force by a penal officer as excessive and unjustified under the Eighth Amendment. 475 U.S. 312, 327 (1986). "It would indeed be surprising if, in the context of forceful prison security measures, 'conduct that shocks the conscience' or 'afford[s] brutality the cloak of law,' and so violates the Fourteenth Amendment, *Rochin v. California,* 342 U.S. 165, 172, 173, 72 S. Ct. 205, 210, 96 L.Ed. 183 (1952), were not also punishment 'inconsistent with contemporary standards of decency' and 'repugnant to the conscience of mankind,' *Estelle v. Gamble,* 429 U.S., at 103, 106, 97 S. Ct., at 290, 292, in violation of the Eighth." *Whitley*, 475 U.S. at 327. The Court sees no reason why the Eighth Amendment should not also be the appropriate doctrine to invoke when a prisoner challenges the conditions of her confinement by alleging that a corrections officer was deliberately

indifferent to her health and safety. Particularly as here, where Rhodes argues that Defendants' conduct falls in the "middle ground of culpability" where deliberate indifference can shock the conscience in some circumstances. *See* ECF No. 55, PageID.610-11 (quoting *Guertin*, 912 F.3d at 923 (holding that some conduct "may or may not be shocking depending on the context . . . *deliberate indifference* that shocks in one environment may not be so patently egregious in another")); *see also* Peter J. Rubin, *Square Pegs and Round Holes: Substantive Due Process, Procedural Due Process, and the Bill of Rights*, 103 Colum. L. Rev. 833, 868 (2003) ("To the extent that a substantive due process claim were raised that a condition of confinement were 'shocking to the conscience' because of its barbarism or cruelty, then, the cruel and unusual punishments clause could be said to provide the measure of substantive of substantive due process protection."). Indeed, Plaintiff concedes that "the standard is essentially the same across all of Ms. Rhodes' claims." ECF No. 55, PageID.615. Accordingly, the Court concludes that the Eighth Amendment, rather than Fourteenth Amendment substantive due process, is the appropriate doctrine for Rhodes to invoke given her allegations. *See McCracken v. Haas*, 324 F.Supp.3d 939, 954-55 (E.D. Mich. 2018) (dismissing the plaintiff's Fourteenth Amendment claim because he brought an Eighth Amendment deliberate indifference cause of action for the same incident) (citing *Walker v. Norris*, 917 F.2d 1449, 1455 (6th Cir. 1990)).

The Court thus **GRANTS** Defendants' motion for summary judgment as to Count II.

## C. Substantive Due Process – "State-Created Danger" (Count IV)

To bring a "state created danger" claim, the individual must show: "(1) an affirmative act by the state which either created or increased the risk that the plaintiff *would be exposed to an act of violence by a third party;* (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff." *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003) (emphasis added); *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998); *see also DeShaney v. Winnebago Cty. Dept. of Social Servs.*, 489 U.S. 189, 201-02 (1989).

Defendants assert that Plaintiff cannot meet the first requirement—that the state's affirmative act exposed her to an act of violence by a *third party*. ECF No. 48, PageID.474. *Jones v. Reynolds* explains the importance of this requirement to a state-created danger claim. 438 F.3d 685 (6th Cir. 2006). Jones was killed after being struck by a drag race driver. Jones' estate brought a 1983 suit against police officers who arrived at the scene before the race and allowed the race to proceed. Because a private actor physically killed Jones, the Court

analyzed her estate's claim under the "state created danger" theory. It then concluded that "[b]ecause the officers did not have custody of Denise Jones at the time of the accident, because the officers' actions did not place Denise Jones in any more danger than she voluntarily undertook before they arrived and because the officers' participation in this tragedy did not specially place Denise Jones in any more risk than the 150-300 people attending the drag race, all relevant precedent requires us to uphold the judgment of the district court summarily rejecting this constitutional claim." 438 F.3d at 688.

Here, Rhodes does not allege that actions by Jones and McPherson created or increased her risk of harm by a *private third-party actor*. Rather, she argues *they* harmed her with the laundry cart. As stated in *Jones*, "[h]ad the officers organized or participated in this race, the issue would cease to turn on whether they were responsible for harm *caused by a private actor* and would turn instead on whether they had caused the harm themselves." 438 F.3d at 695 (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998) (noting that officers will be liable under the Due Process Clause for injuries caused by "grossly negligent" or "reckless" conduct that "shock[s] the conscience")). "Under these circumstances, [the Court] would have no reason to determine whether the officers had increased the risk of harm to the victim because they would *be the source* of that risk." 438 F.3d at 695 (emphasis in original).

To refute this requirement, Plaintiff cites cases from other circuits and one unpublished Sixth Circuit case, *Schneider v. Franklin Cty.*, 288 Fed.Appx. 247, 252-53 (6th Cir. 2008) (unpublished disposition). In *Schneider*, the Sixth Circuit reformulated the *DeShaney* and *Kallstrom* test by removing the requirement that the state officer expose the plaintiff to injury or violence "by a third party." But *Schneider* appears to be an anomaly. The Sixth Circuit recently addressed the "state-created danger" doctrine in *Estate of Romain v. City of Grosse Pointe Farms* and applied the standard rule that "the state-created danger doctrine allows plaintiffs to bring due process claims under § 1983 for harms *caused by private actors*." 935 F.3d 485, 491 (6th Cir. 2019) (emphasis added); *see also In re Flint Water Cases*, 384 F.Supp.3d 802, 862-65 (E.D. Mich. 2019) (describing *Schneider* as applying an "incomplete version of this circuit's test for a state-created danger claim" by failing to include the requirement that the defendant created or increased the risk that they would be exposed to an act of violence by a third party).

Because Plaintiff does not allege that Jones and McPherson created or increased her risk of harm by a private third-party actor, her Fourteenth Amendment Substantive Due Process (State Created Danger) claim must fail. Accordingly, the Court **GRANTS** Defendants' motion for summary judgment as to Count IV.

## IV. Conclusion

Based on Plaintiff's statements in open court and in accordance with the rulings set forth in this opinion and order, the following Defendants were **DISMISSED WITH PREJUDICE:** Glen Garbinski, Sonal Patel, Stephanie Jackson, Shontel Barnes, Tonya Allen, and Norman Laughlin.

And for the reasons stated above, Defendants' motion for summary judgment is **GRANTED**.

**IT IS SO ORDERED**.

DATED: February 28, 2020.

BY THE COURT:

/s/Terrence G. Berg
TERRENCE G. BERG
United States District Judge